UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RONALD MAXWELL,

                Plaintiff,

v.                                             5:05-CV-0817
                                                    (GTS/GJD)
METROPOLITAN LIFE INSURANCE
COMPANY; and LOCKWOOD & GREENE,
INC. HEALTH AND BENEFIT PLAN,

                Defendants.
_____

APPEARANCES:                                   OF COUNSEL:

SHANLEY LAW OFFICES                   P. MICHAEL SHANLEY, ESQ.
  Counsel for Plaintiff                          KRISTIN ANN SHANLEY, ESQ.
3386 Main Street
P.O. Box 359
Mexico, NY 13114

HODGSON RUSS LLP                         CATHERINE GRANTIER COOLEY, ESQ.
  Counsel for Defendants                   HUGH M. RUSS, III, ESQ.
The Guaranty Building                      JULIA M. HILLIKER, ESQ.
140 Pearl Street, Suite 100
Buffalo, NY 14202-4040

HON. GLENN T. SUDDABY, United States District Court Judge

## MEMORANDUM DECISION and ORDER

       This action was filed pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. Generally, in his Second Amended Complaint, Ronald Maxwell ("Plaintiff") alleges that Metropolitan Life Insurance Company ("Defendant MetLife") and the Lockwood & Greene, Inc. Health and Benefit Plan ("Defendant Lockwood") denied Plaintiff benefits under a Long Term Disability Benefits Plan to which he was entitled under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B). (Dkt. No. 13 [Plf.'s Second Am. Compl.].)

Currently pending before the Court are two motions: (1) a motion for summary judgment filed by Defendant MetLife and Defendant Lockwood (collectively "Defendants") pursuant to Fed. R. Civ. P. 56; and (2) Plaintiff's motion to strike the testimony of Dr. Richard M. Fiese, D.M.D. from the administrative record (specifically, AR 413-441) pursuant to Fed. R. Evid. 103(b). (Dkt. Nos. 39, 53.)  For the reasons set forth below, Defendants' motion is denied; Plaintiff's motion to strike is denied as moot; and counsel are directed to, on or before September 15, 2009, contact the undersigned's courtroom deputy, Lori Welch, to schedule a prompt bench trial in this matter.

## I.     RELEVANT BACKGROUND

The material facts of this case are not in dispute.

Plaintiff worked for Lockwood & Greene, Inc. (hereinafter "Lockwood") for a number of years as an engineer (specifically a start-up manager).  The job required Plaintiff to travel to various locations around the country for periods of time.  Beginning in or around September 2001, Plaintiff was allowed to work from home (in Oswego, New York) until January 2002 following neck surgery that he underwent.  Subsequently, and until his termination on May 2, 2003, Plaintiff returned home on a number of occasions for personal and/or medical reasons.

### A.     Plan Documents

During the time of Plaintiff's employment with Lockwood, Lockwood had a Long Term Disability Plan ("Plan"), under which Plaintiff was covered.  (AR 70.)  The Plan states that an employee "will cease to be covered [under the Plan] on the earliest of the following dates" and lists "the date you are laid off" as one of those dates.  (AR 31-32.)  Thus, an employee who is not disabled until after the date on which that he or she is terminated is not eligible to recover

benefits under the Plan. (*Id.*) Under the terms of the Plan, the term "disabled" or "disability" means

> that, due to sickness, . . . [a participant is] receiving Appropriate Care and Treatment from a Doctor on a continuing basis . . . and[,] after the elimination period, [the participant is] unable to earn more than 60% of [his] Indexed Predisability Earnings from any employer in [his] Local Economy at any gainful occupation for which [he is] reasonably qualified taking in to account [his] training, education, experience and Predisability Earnings.

(AR 19.) The term "Appropriate Care and Treatment" means

> medical care and treatment that meet all of the following [criteria]:
> 1. it is received from a Doctor whose medical training and clinical experience are suitable for treating [the participant's Disability];
> 2. it is necessary to meet [the participant's] basic health needs and is of demonstrable medical value;
> 3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;
> 4. it is consistent with the diagnosis of [the participant's] condition; and
> 5. its purpose is maximizing [the participant's] medical improvement.

(AR 20.) The "elimination period" is "90 days" of continuous Disability (followed by five years of continuous Disability). (AR 11.) The "elimination period" begins on the day [the participant] become[s] Disabled." (AR 18.) In addition, although the Plan is less than a model of clarity, it provides that the participant may not work more than 30 of the 90 days of the elimination period, without restarting the running of the elimination period.[1]

### B. Plaintiff's Pre-Cancer Medical History

---

[1] Specifically, the Plan provides that, "[i]f you return to work for 30 days or less during your Elimination Period, those days will count towards your Elimination Period. However, if you return to work for more than 30 days before satisfying your Elimination Period, you will have to begin a new Elimination Period." (AR 19.) Finally, it should be noted that, according to the Plan, "[i]f a new Disability occurs while Monthly Benefits are payable, it will be treated as part of the same period of Disability." (AR 29.)

Prior to undergoing testing and treatment for cancer in 2001, Plaintiff's medical history is best summarized as follows. In 1989, Plaintiff suffered a heart attack. (AR 121.) In 1999, Plaintiff was diagnosed with a C-5 root problem. (AR 113.) At some point at or around this time, Plaintiff had "a work up performed for chronic trauma related cervical spine disease." (AR 110.) Following this "work up," Plaintiff was recommended for spinal surgery by a spinal surgeon. (*Id*.) However, Plaintiff "felt the symptoms were not severe enough nor did he have enough time to consider surgery." (*Id*.) In addition, Plaintiff was involved in a "severe motor vehicle accident where he suffered a whiplash type injury to his neck." (*Id*.)

    **C.**    **Plaintiff's Cancer Condition and Treatment**

On August 8, 2001, Plaintiff was diagnosed with Squamas Cell Carcinoma of the tonsil. (AR 753.) In or around September 2001, he underwent radiation treatment for the Squamas Cell Carcinoma. (AR 474, 480.) At the time, Defendants knew of Plaintiff's condition and treatment. (AR 480.) On December 7, 2001, Plaintiff underwent post-radiation neck surgery (specifically a type 3 radical neck dissection) in an effort to cure neck pain stemming from his previous motor vehicle accident. (AR 110, 113, 119, 121.)[2]

In December of 2002, Plaintiff was working in Arizona. (AR 461, 470.) On December 24, 2002, Plaintiff visited Dr. Richard Fiese (an oral and maxillofacial surgeon) in Oswego, New York, about a painful condition he was experiencing in which a portion of bone that had become exposed in the right part of his lower jaw following his radiation treatment. (AR 470, 474.) At the time, Defendants knew of Plaintiff's exposed bone in the right part of his lower jaw. (AR

---

[2] It is undisputed that, after Plaintiff's neck surgery, he began experiencing chronic shoulder pain and stiffness. (AR 110, 113, 118.)

480, 482.)³

Dr. Fiese diagnosed the condition as Osteoradionecrosis, removed the bone, and recommended that Plaintiff begin hyperbaric oxygen ("HBO") therapy and consider surgery to combat the condition. (AR 470, 474.) Preparing to return to work in Arizona, Plaintiff told Dr. Fiese that he "between trimming off the dead bone and lots of vodka he will be fine" without the HBO therapy and surgery. (AR 461, 474.) However, roughly one week later, Plaintiff's wife contacted Dr. Fiese, and informed him that her husband would accept a referral for a follow-up regarding the HBO therapy and surgery in Arizona. (AR 470, 474-75.) As a result, on or about December 30, 2002, Dr. Fiese wrote Plaintiff a referral, providing him with a list of various treating physicians in Arizona. (AR 462, 470, 475.)

On January 23, 2003, Plaintiff flew from Arizona to Syracuse, New York, for a medical appointment with Dr. Fiese regarding his Osteoradionecrosis. (AR 201, 478.) On January 28, 2003, Plaintiff returned to Arizona and met with a doctor who had been recommended by Dr. Fiese, regarding HBO therapy. (AR 209, 211, 478.)

However, shortly thereafter, Lockwood informed Plaintiff that he was being relocated to Mississippi. (AR 478.) In February of 2003, Plaintiff was relocated to Mississippi. (AR 478-479.) In response, Plaintiff contacted Dr. Fiese to make arrangements to receive HBO therapy in either Mississippi or Central New York. (AR 478-479.)

On March 18, 2003, Plaintiff visited Dr. Fiese regarding treatment for his Osteoradionecrosis, and informed Dr. Fiese that he would like to commence HBO therapy. (AR

---

³ In his affidavit, Plaintiff states that, from January 2003 through his termination on May 2, 2003, his supervisors allowed him to work "under certain conditions" because he "was not at full capacity." (AR 480.)

311, 462, 475, 479.)  Dr. Fiese informed Plaintiff that he would contact the HBO therapy Unit at SUNY Health Center in order for Plaintiff to undergo a pre-therapy evaluation.  (AR 475.)  In addition, Dr. Fiese informed Plaintiff that he would be unable to work for a period of time once HBO therapy commenced.  (AR 479.)

On March 26, 2003, Dr. Fiese forwarded a letter to Dr. Camporesi at the HBO therapy Unit at SUNY Health Center.  (AR 462, 471.)  Shortly thereafter (the exact date is unknown), Plaintiff notified Lockwood that he would be starting HBO therapy on May 5, 2003.  (AR 479.)  On or around this time, Plaintiff also discussed his employment with Lockwood's personnel office.  (*Id*.)  During that discussion, it was agreed that Plaintiff's last day of work would be on May 2, 2003.  (*Id*.)

In late March or early April, Plaintiff requested disability forms from Lockwood.  (*Id*.)  In late March or early April, the disability forms were sent to and completed by Dr. Fiese and returned to Lockwood.  (*Id*.)  However, at some point during the course of Lockwood's filing for bankruptcy, these forms were lost.  (AR 71.)

On April 2, 2003, Plaintiff's health insurance carrier contacted Dr. Fiese, informing him that a review was required prior to Plaintiff being covered for HBO therapy.  (AR 475.)  In response, Dr. Fiese contacted a representative of Cigna and explained the background for the HBO therapy pursuant to Cigna's policy requirements.  (AR 475.)

On April 16, 2003, while stationed in Mississippi, Plaintiff was informed that Lockwood was going to terminate Plaintiff's employment and end its contribution to his 401K Plan on May 3, 2003, due to a downsizing of his work force.  (AR 96, 369.)  On April 25, 2003, Lockwood informed Plaintiff that he would be laid off effective May 2, 2003.  (AR 387.)

On April 30, 2003, Plaintiff left the job site in Mississippi where he was working and

6

traveled by car to West Virginia, on his way home to Oswego, New York. (AR 85.) Plaintiff arrived at his home on May 2, 2003. (AR 85.) Subsequently, Lockwood compensated Plaintiff for his travel expenses through May 2, 2003, and paid him for his work as an employee through May 2, 2003. (AR 85-88.)

The record reflects that, for at least the time period of December 2002 through May 2, 2003, Plaintiff lost strength and weight as a result of Osteoradionecrosis. (AR 475, 482.) In addition, during approximately the same time period, he had a "persistent infection," and was taking "heavy dosages of antibiotics," specifically Amoxicillin, to treat the infection. (AR 453, 475; *see also* AR 70, 753.) Moreover, during approximately the same time period, he experienced nerve pain, for which he took Neurontin. (AR 110, 461-62; *see also* AR 70, 115, 140, 753.)

At some point, Plaintiff's appointment on May 5, 2003, was rescheduled to May 9, 2003. (AR 405, 479, 487, 741, 742-743.) On or about May 9, 2003, Plaintiff was evaluated by the HBO Unit and was accepted for HBO therapy. (AR 405, 439, 441, 475, 487, 741, 742-743.) Plaintiff underwent his first round of HBO therapy on May 16, 2003. (AR 405, 487, 741, 742-743.) Plaintiff underwent thirty daily treatments. (AR 100.)

On July 25, 2003, after the conclusion of the thirty treatments, Plaintiff underwent surgical debridement of his necrotic jaw because his wounds would not heal. (AR 100, 464, 752.) Following surgery, Plaintiff underwent additional HBO therapy. (AR 100.) In August 2003, Plaintiff was experiencing right shoulder and arm pain that rendered him unable to grasp anything. (AR 110, 111.) A magnetic resonance imaging ("MRI") scan of Plaintiff's cervical spine performed in or around late August 2003 revealed "significant cervical spinal stenosis with signs suggesting direct cord compression." (AR 111.) Dr. Jonathan Braiman, who reviewed

Plaintiff's MRI, stated that his "working diagnosis could suggest multiple lesions[,] . . . long standing stable myelopathy with nerve root involvement based on post traumatic changes[,] [b]ased on his past surgery with preceding XRT 2 years ago, he could have cervical plexo radiculopathy from direct injury from the radical neck dissection near the cervical plexus, post surgical inflammation, or radiation induced injury."  (AR 111.)

Dr. Braiman referred Plaintiff to Dr. Jeffrey Winfield, a neurosurgeon, who conducted an evaluation of Plaintiff on September 10, 2003.  (AR 113.)  Dr. Winfield concluded that Plaintiff has Horner's, noting that "we do not know whether or not this is new."  (AR 115.)  Dr. Winfield also concluded that Plaintiff's pain, as well as the strength in his hand, was improving, but that he continued to suffer from severe atrophy of his right shoulder.  (AR 113-115.)  In addition, Dr. Winfield concluded (as did Dr. Brainman) that Plaintiff was suffering from thoracic outlet injury.  (AR 115.)  To help Plaintiff with his pain, Dr. Winfield prescribed Neurontin and a Medrol Dose pack.  (*Id*.)

### D.     Plaintiff's Long Term Disability Claim

On April 5, 2004, Plaintiff submitted an Long Term Disability ("LTD") claim to the Plan, stating that he had become disabled on May 2, 2003.  (AR 138.)  On May 17, 2004, Plaintiff was awarded Social Security disability, with the Social Security Administration finding that Plaintiff became disabled on May 2, 2003.  (AR 90.)

On June 3, 2004, Defendant MetLife denied Plaintiff's claim for benefits under the Plan.  (AR 96-97.)  Plaintiff appealed the decision, which Defendant MetLife again denied.  In denying the appeal, Defendant MetLife stated that, although Plaintiff was traveling home from a job on May 2, 2003, and was paid through May 2, 2003, he was laid off on May 2, 2003, and therefore, under the terms of the Plan, was not considered a covered employee or Plan participant on May

2, 2003. (AR 79-81.) Following the appeal, Plaintiff commenced the current action in this Court.

In the interest of brevity, the Court will not recite this action's entire procedural history. The Court will note only that the parties' current motion papers identify the following two issues to be resolved by the Court: (1) whether Plaintiff was a "covered" employee (under the Plan) on May 2, 2003, and (2) whether Plaintiff was "disabled" (under the Plan) on May 2, 2003.[4]

## II.     APPLICABLE LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward

---

[4] Defendants have already determined administratively that, on the date Plaintiff claimed he became disabled, he was (1) no longer a participant under the Plan, and (2) not disabled as defined by the Plan. (Dkt. No. 39, Part 4, at 4.) More specifically, Defendants determined that, because Plaintiff was laid off on May 2, 2003, under the terms of the Plan, he was not considered a covered employee or Plan participant on May 2, 2003. (AR 79-81.) In addition, Defendants determined that, even if Plaintiff was a covered employee on May 2, 2003, he cannot recover benefits under the Plan because he was not disabled (as defined under the Plan) on May 2, 2003, based on his ability to work on that date. (AR 486-488.) Plaintiff argues that he was an employee on May 2, 2003, and was also disabled on this date.

with "specific facts showing a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg*., 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]; *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has famously explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. [citation omitted].

"It is appropriate to consider a challenge under ERISA to the denial of disability benefits as a summary judgment motion reviewing the administrative record." *Suarato v. Building Services 32BJ Pension Fund*, 554 F. Supp.2d 399, 414-415 (S.D.N.Y. 2008) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 [2d Cir. 2003]); *see also Gannon v. Aetna Life Ins. Co.*, 05-CV-2160, 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 27, 2007) ("[S]ummary judgment provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record."); *Chitoiu v. UNUM Provident Corp*., 05-CV-8119, 2007 WL 1988406, at *3 (S.D.N.Y. July 6, 2007); *Perezaj v. Bldg. Serv. 32B-J Pension Fund*, 04-CV-3768, 2005 WL 1993392, at *4 (E.D.N.Y. Aug.17, 2005) ("A court evaluating a fund's final decision under the arbitrary and capricious standard should therefore grant summary judgment to the fund where there is no genuine dispute regarding whether the decision was arbitrary and capricious.").

B.     **Legal Standard Governing Plaintiff's Claim Under ERISA**

"ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). Rather, the Supreme Court has explained "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the [plan] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co.*, 489 U.S. at 115.

"[W]here the ERISA plan confers upon the plan administrator discretionary authority to 'construe the terms of the plan,' the district court should review a decision by the plan administrator under an excess of allowable discretion standard." *Frommert v. Conkright*, 535 F.3d 111, 119 (2d Cir. 2008) (citing *Nicols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005) [noting that the proper standard when a Plan vests the administrator with discretionary authority is "abuse of discretion."]). Under such a standard, an administrator abuses its discretion only when the administrator's actions are arbitrary and capricious. *See, e.g., Guglielmi v. Northwestern Mut. Life Ins. Co.*, 06-CV-3431, 2007 WL 1975480, at *4 (S.D.N.Y. July 6, 2007) (quoting *Firestone Tire & Rubber Co.*, 489 U.S. 101, 115 [1989]). Because this is a "highly deferential standard of review, an administrator's decision should only be disturbed if it is without reason, unsupported by substantial evidence or erroneous as a matter of law, considering the relevant factors of the decision." *Guglielmi*, 2007 WL 1975480, at *4 (citations and internal quotations omitted).[5] A district court must look to the administrative record as a

---

[5] "Substantial evidence consists of such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Guglielmi*, 2007 WL 1975480, at *4 (citation and internal quotations omitted).

11

whole in deciding whether the plan administrator's decision was without reason, unsupported by substantial evidence or erroneous as a matter of law. *See, e.g.*, *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 19 (1st Cir. 2003) (citing *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 [3d Cir. 1997]).

Here, given the language of the Plan, pursuant to *Firestone Tire & Rubber Co.*, the Court concludes that the proper standard of review in this case is whether the Plan Administrator's decision was arbitrary and capricious. (*See* AR 50.)

### 1. One Factor to Be Considered: Conflict of Interest

A deferential standard of review is appropriate where the plan grants the administrator discretionary authority to determine eligibility benefits. However, in the aftermath of *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132-33 (2d Cir. 2008) (citing *Glenn*, 128 S. Ct. at 2348). "This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation." *McCauley*, 551 F.3d at 133 (citing *Glenn*, 128 S. Ct. at 2348). In addition, "for ERISA purposes," the rule is no different "where the plan administrator is not the employer itself but rather a professional insurance company." *Glenn*, 128 S. Ct. at 2349-50.

"[W]hen judges review the lawfulness of benefit denials, they [should] take account of several different considerations of which a conflict of interest is one." *Glenn*, 128 S. Ct at 2351. In instances where there are multiple factors for a court to consider, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id*. Under this

"combination-of-factors method of review," *see Glenn*, 128 S. Ct. at 2351, "[t]he weight given to the existence of the conflict of interest will change according to the evidence presented." *McCauley*, 551 F.3d at 133.

For example, "[t]he conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn*, 128 S. Ct at 2351. "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id*. (citations omitted).

In addition to the well-recognized "structural conflict" that exists where the administrator both evaluates and pays benefits claims, courts in various circuits have recognized other types of conflicts that may also be taken into account and weigh as a factor in determining whether there was an abuse of discretion. *See, e.g., Harrison v. Prudential Ins. Co. of America*, 543 F. Supp.2d 411, 421-22 (E.D. Pa. 2008) ("A conflict also exists and a 'more searching scrutiny' is required where the impartiality of the administrator is called into question. This potential for prejudice can arise either because the structure of the plan itself inherently creates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case.") (internal quotation marks and citations omitted).

### 2.     Another Factor to Be Considered: Procedural Irregularities

Procedural irregularities in the administrative process constitute factors that should also be taken into consideration in determinating whether a plan administrator abused its discretion in

denying a claimants claim for benefits under the ERISA plan.  *Glenn*, 128 S.Ct. at 2351-52; *McCauley*, 551 F.3d at 134-36; *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006); *Leu*, 2009 WL 2219288, at *3.  Examples of procedural irregularities include the plan administrator (1) initially providing one reason for denying a benefits claim, and then offering a new reason for the denial on review, in addition to the original reason,[6] (2) emphasiz[ing] a certain medical report that favor[s] a denial of benefits, [and] . . . deemphasiz[ing] certain other reports that suggest[] a contrary conclusion,[7] (3) "rel[ying] on the opinions of its own non-treating physicians over the opinions of [p]laintiff's treating physicians" when deciding to reverse a prior award,[8] and (4) "encourag[ing] [the claimant] to argue to the Social Security Administration that []he could do no work . . . , and then ignor[ing] the agency's finding in concluding that [the claimant] could in fact do sedentary work."[9]

## III.   ANALYSIS

### A.   First Factor: Apparent Conflict of Interest

---

[6]   *See Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech, Inc.*, 125 F.3d 794, 798-99 (9th Cir. 1997) (where the administrator originally denied a benefits claim because plaintiff was unable to show "that her disability was 'caused or contributed to' by a physical ailment, [o]n review, when confronted with clear evidence . . . that [plaintiff] did suffer from a physical ailment . . . [in addition to demanding more evidence, the administrator] took the [alternative position] that, regardless of the cause of the disability, the critical determinants of whether a person was afflicted with a 'mental disorder' were symptoms and not causes."  The court "conclude[d] that the inconsistencies in the reasons [the administrator] gave for its refusals to lift the 'mental disorder' limitation constitute material, probative evidence that its decision was affected by self-interest."); *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1564 (11th Cir. 1990) (finding a procedural irregularity where the administrator originally denied payments for two periods of hospitalization, and then changed its position for one of those periods, on the basis of no new evidence.).

[7]   *See Glenn*, 128 S. Ct at 2351-52.

[8]   *Harrison v. Prudential Ins. Co. of America*, 543 F. Supp.2d 411, 421-22 (E.D. Pa. 2008) (internal quotation marks and citations omitted).

[9]   *See Glenn*, 128 S.Ct at 2351-52.

As an initial matter, Defendants both evaluate and pay benefits claims under the Plan (and the record is not clear as to what steps Defendants have taken to reduce potential bias and to promote accuracy). Thus, a conflict of interest appears to exist.

As a result, the Court finds that this factor weighs in favor of finding that, at the very least, a genuine issue of material fact exists as to whether Defendants' decision amounted to an abuse of discretion.

### B. Second Factor: Apparent Procedural Irregularities

The record contains evidence of the following facts indicating the existence of the type of procedural irregularities that have already been recognized by other federal courts: (1) Defendants initially denied Plaintiff's claim because they found that Plaintiff was not a covered employee on May 2, 2003, and then, when the current action was filed this Court, Defendants offered as an alternative explanation for denial the fact that Plaintiff was not disabled within the meaning of the Plan on May 2, 2003; (2) Defendants gave little or no weight to Plaintiff's treating physician's letter of January 2, 2008, in which he stated that Plaintiff was "disabled" as defined under the Plan on May 2, 2003, emphasizing instead the general conclusion of its consultants that Plaintiff was capable of performing sedentary work on May 2, 2003; and (3) the Plan requires a participant to seek out social security disability, yet Defendants ignored the agency's finding that Plaintiff was disabled on May 2, 2003.

In addition, the Court finds that there are two other procedural irregularities worth mentioning. First, Defendants could have, but failed to, investigate Plaintiff's functional abilities prior to his termination. The Court finds this significant in light of the fact that Plaintiff is deemed disabled under the Plan if he could not have engaged in gainful employment, for which

15

he is reasonably qualified (earning more than 60% of his Indexed Predisability Earnings).[10]

Second, Defendants could have, but failed to, consider that Plaintiff may have been disabled while he was working for Lockwood.[11]

As a result, the Court finds that this factor weighs in favor of finding that, at the very least, a genuine issue of material fact exists as to whether Defendants' decision amounted to an abuse of discretion.

### C. Whether Some Record Evidence Exists from Which a Rational Fact-Finder Could Conclude that Defendants' Decision Was Without Reason

#### 1. Defendants' Decision that Plaintiff Was Not Disabled (Under the Plan) on May 2, 2003

As explained above in Part I.A. of this Decision and Order, under the Plan, a participant is disabled if the following is true: (1) due to sickness, he is receiving appropriate care and

---

[10] Because the Plan determines disability (in part) by examining whether the claimant could have been gainfully employed elsewhere, in order to determine whether Plaintiff was disabled while employed at Lockwood, the extent of his functional abilities could have, and arguably should have, been examined. *See Schofield v. Metropolitan Life Ins. Co.*, 297 F. App'x. 697, 699 (9th Cir. Oct. 30, 2008) (noting that, where a plan required a claimant to be unable to earn more than 80% of predisability earnings in order to be considered disabled, it was improper for MetLife not to apply the 80% test based on the reasoning "that because . . . [plaintiff] could do her prior job, she could earn 100% of her prior salary"); *Whatley v. CNA Ins. Companies*, 189 F.3d 1310, 1313-1314 (11th Cir. 1999) (reversing district court's conclusion affirming denial of plaintiff's benefits on the grounds that, although plaintiff may have been able to show up to work and collect a paycheck, he may not have been able to "perform the substantial and material duties" of his job, as required under the benefits plan.) (citing *Kirwan v. Marriott Corp.*, 10 F.3d 784, 786 [11th Cir. 1994]).

[11] *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) (dismissing the insurer's argument that, because the claimant had fibromyalgia for seven years while working, he could not be disabled without proof that the condition worsened, noting that "[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling."); *Seitz v. Metropolitan Life Ins. Co.*, 433 F.3d 647, 651-652 (8th Cir. 2006) (The fact that claimant continued to work after his spinal problems of spondylosis and degenerative disc disease were diagnosed, and that his condition did not significantly change between the time of diagnosis and the day he quit working and sought benefits, did not mean that he was not disabled within the meaning of the disability policy, where there was no dispute that claimant's physical abilities were limited at the time he quit working).

treatment from a doctor on a continuing basis; and (2) ninety days after receiving such care and treatment, the participant is unable to earn more than sixty percent of his "Indexed Predisability Earnings" from any employer in his local economy at any gainful occupation for which he is reasonably qualified, taking into account training, education, experience and "Predisability Earnings."

Based on this definition, the Court finds that at least some record evidence exists from which a rational fact-finder could conclude that Defendants' decision that Plaintiff was not disabled (under the Plan) on May 2, 2003, was without reason. This record evidence includes, but is not limited to, the following: (1) the fact that Plaintiff began treatment for Osteoradionecrosis on December 24, 2002, and was treated continuously for that condition up to and after May 2, 2003; (2) the fact that Plaintiff visited a doctor in Arizona on January 28, 2003, regarding HBO therapy, but was unable to begin HBO therapy at that time because his employer relocated him in February 2003;[12] (3) the fact that Plaintiff lost significant strength and weight as a result of his disease between December 2002 and May 2, 2003;[13] (4) the fact that Plaintiff had a persistent infection, an exposed mandible, and was taking heavy doses of antibiotics to combat his condition between December 2002 and May 2, 2003; (5) Plaintiff's statement in his affidavit that, between December 2002 and May 2, 2003, his supervisors allowed him to work "under certain conditions" because he was "not at full capacity"; (6) the letter sent to Defendants from Phil Edwards (Plaintiff's roommate in Mississippi from February 2003 to May 2003) describing Plaintiff's difficulties performing simple tasks, such as eating and holding a pencil between

---

[12] AR 490.

[13] *See* AR 475, 482.

February 2003 and May 2003;[14] (7) the fact that, on March 18, 2003, Plaintiff asked Dr. Fiese to schedule an appointment for an HBO therapy evaluation (which was ultimately scheduled for May 5, 2003); (8) the fact that Dr. Fiese filled out short-term disability paperwork on behalf of Plaintiff prior to his termination;[15] (9) the fact that Plaintiff's employer agreed to allow Plaintiff to go on short-term disability leave after May 2, 2003;[16] (10) the fact that, once Plaintiff started HBO therapy on May 16, 2003, it appears he was thereafter rendered unable to work in his local economy at any gainful occupation for which he is reasonably qualified; (11) the fact that the Social Security Administration subsequently determined that Plaintiff was disabled as of May 2, 2003; and (12) Dr. Fiese's letter of January 2, 2008, informing Defendants that, in his medical opinion, Plaintiff was disabled on or before May 2, 2003.

### 2. Defendants' Decision that Plaintiff Was Not a "Covered" Employee (Under the Plan) on May 2, 2003

Similarly, the Court finds that at least some record evidence exists from which a rational fact-finder could conclude that Defendants' decision that Plaintiff was not a "covered" employee (under the Plan) on May 2, 2003, was without reason. More specifically, Plaintiff was paid to work as an employee of Lockwood on May 2, 2003. In addition, Plaintiff's paycheck reflects that he contributed to his benefits plan through May 2, 2003. Further, Plaintiff was reimbursed for travel expenses that he incurred on May 2, 2003. Finally, Dr. James Wortman, one of Defendants' independent physician consultants, acknowledged that Plaintiff was employed by

---

[14] AR 482.

[15] AR 491.

[16] AR 491.

Lockwood through May 2, 2003.[17]

Under analogous circumstances, courts have found that an employee was covered under a plan on his or her last day of work. *See, e.g., Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 379-380 (2d Cir. 2002) (affirming, in part, district court decision finding that a plaintiff was employed on her last day of work based on following evidence: [1] plaintiff's testimony that she worked on the day of her termination, [2] the employer's letter to plaintiff regarding her benefits, and [3] the fact that the employer paid premiums to First UNUM to cover plaintiff through her last day of work); *Newman v. UNUM Life Ins. Co. of America*, 99-CV-7420, 2000 WL 1593443, at * 2 (N.D. Ill. Oct. 23, 2000) (finding that it was arbitrary and capricious to conclude that an employee was not an active employee on the date that he was terminated, pointing out that defendant, in reaching its conclusion, "not only took portions of the policy out of context and assigned meaning to them that is not supported by the text of the policy, [but] also disregarded salient portions of the policy.").

For all of these reasons, Defendants' motion for summary judgment is denied.

### D.     **Plaintiff's Motion to Strike**

Based on the Court's denial of Defendants' motion for summary judgment, the Court denies as moot Plaintiff's motion to strike the testimony of Dr. Richard M. Fiese, D.M.D. from the administrative record.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 39) is **DENIED**; and it is further

---

[17] Specifically, in his independent review of Plaintiff's medical records, Dr. Wortman stated that "[a]ccording to the records, the claimant was 'laid off' on 5/03/2003 (last day of work 5/02/2003) due to a downsizing of his work force." (AR 417.)

**ORDERED** that Plaintiff's motion, pursuant to Fed. R. Evid. 103(b), to strike the testimony of Dr. Richard M. Fiese, D.M.D. from the administrative record (Dkt. No. 53) is **<u>DENIED</u>** as moot; and it is further

**ORDERED** that, on or before September 15, 2009, counsel contact the undersigned's courtroom deputy, Lori Welch, to schedule a prompt bench trial in this matter.

Dated: September 1, 2009
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge